FILED

JUL 10 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO: 1:24 CR 00252 |
| RONALD TOUCHARD, PAUL GARCIA, | ) ) ) ) ) | Title 15, United States Code, Sections 78j(b), 78ff; Title 18, United States Code, Section 371; Title 17, Code of Federal Regulations, Section 240.10b-5 |
| Defendants. | ) | |

GENERAL ALLEGATIONS

JUDGE OLIVER

At all times material to this Indictment, unless otherwise specified:

1. Defendants RONALD TOUCHARD and PAUL GARCIA, and their co-conspirators, engaged in a criminal scheme, conspiring to defraud investors and potential investors in HQ Global Education, Inc. ("HQGE") by issuing millions of shares to themselves at little or no cost and then artificially controlling the trading volume and price of the shares to sell the stock and enrich themselves. Defendants used co-conspirators and nominees to acquire outstanding shares that had little to no value. Defendants and their co-conspirators then artificially inflated the value of the shares through various manipulative trading techniques and fraudulent stock promotions. Once the stock price was inflated, Defendants and their co-conspirators sold their shares to unsuspecting investors while concealing that they were profiting from those sales, causing more than $2 million in losses to investors in the Northern District of Ohio, and elsewhere.

## Relevant Regulatory Principles and Definitions

2. "Microcap" or "penny" stocks were stocks of publicly traded U.S. companies that have low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

3. Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the United States Securities and Exchange Commission ("SEC") in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in the companies subject to SEC regulations; and (c) the public. Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

4. The term "affiliate" in the Securities Act of 1933 included any person directly or indirectly controlling or controlled by, or any person under direct or indirect common control with, the issuer.

5. A "convertible note" was a debt security issued by a company that provided the holder of the convertible note the right, in certain circumstances, to convert the note into equity shares in the company.

6. A "call room" or "boiler room" was a commercial operation that identified prospective investors, contacted them by telephone and email, and encouraged them to purchase, and subsequently not to sell, securities.

7. The federal securities laws required paid promoters to disclose who paid them for the promotion, the amount, and the type of payment; it similarly required brokers to disclose any commissions they would earn from third parties if they brokered a sale of stock. Dishonest promoters and brokers often failed to disclose to investors commission payments from third parties, including payments from issuers and affiliates, which was considered an omission of a material fact as part of a securities transaction under federal securities law.

8. A "pump-and-dump" scheme was a scheme where a group of individuals who controlled the free trading or allegedly unrestricted stock—also referred to as the "float"—if a microcap company fraudulently inflated the share price and trading volume of the targeted public company, through, among other ways, false and misleading SEC filings, press releases, and paid stock promotions. Those individuals who conducted stock promotions were often paid promoters or company insiders and affiliates who stood to gain by selling their shares after creating a buying frenzy and pumping up the stock price. When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain. The promoters, insiders, and affiliates made profits for themselves based on the losses of unsuspecting investors.

<u>Defendants, Relevant Entities, and Bank Accounts</u>

9. Defendant RONALD TOUCHARD ("TOUCHARD") resided in California.

10. Defendant PAUL GARCIA ("GARCIA") resided in California.

11. HQGE was a publicly traded Delaware corporation with its principal place of business in or around Orange County, California. It was incorporated in Delaware on or about January 22, 2008, under the name Green Star Mining Corp. On or about March 22, 2010, the company changed its name to HQ Global Education, Inc. HQGE was a microcap or penny stock, the shares of which were traded under the ticker symbol "HQGE." HQGE made varying

representations about its operations over time, but from in or around 2018, HQGE purported to operate as a consulting company in the CBD oil and hemp products industry.

12. Stock for HQGE was sold and quoted on an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers (the "OTC Market"). Companies trading on the OTC Market tended to be very small, and the stock tended to be closely held, owned by a small number of individuals, and thinly traded, that is, traded far less frequently than stocks in larger companies on larger exchanges.

13. International Stock Group Inc. ("ISG") was incorporated on or about November 27, 2017, as a Delaware corporation. TOUCHARD maintained *de facto* control of all aspects of the business. On or about November 30, 2017, Bank of America account number x3254 was opened in the name of ISG. TOUCHARD was the sole authorized signer on the account.

14. Hemmingway Holdings LLC ("Hemmingway") was incorporated on or about December 13, 2016, as a Delaware limited liability company. GARCIA was listed as the control person of Hemmingway. On or about December 19, 2016, Bank of America account number x6290 was opened in the name of Hemmingway Holdings LLC. Garcia was the sole authorized signer on the account.

## The Conspiracy and Scheme To Defraud

15. From in and around November 2017, through in or around December 2018, TOUCHARD, GARCIA, and others known and unknown to the Grand Jury conspired to commit securities fraud, defrauding investors and potential investors in HQGE in a pump-and-dump scheme by issuing millions of shares of stock to themselves at little or no cost, often held in the names of nominee co-conspirators, and then artificially inflating the price by engineering trading volume while creating the appearance of positive news about the company, before selling their shares to unsuspecting investors.

*Objects of the Conspiracy and Scheme to Defraud*

16. The objects of the conspiracy and scheme to defraud included, but were not limited to: (1) inflating the value of HQGE defrauding the investors; (2) defrauding investors and obtaining their monies; (3) paying and receiving undisclosed commissions; (4) enriching the conspirators; and (5) concealing the conspiracy and scheme.

*Manner and Means of the Conspiracy and Scheme to Defraud*

17. It was part of the conspiracy and scheme to defraud that:

    a. Defendants and their co-conspirators obtained and made use of "shell" companies, like ISG and Hemmingway, to acquire and transact in securities, and established and used bank accounts in the names of those companies, to give their transactions the appearance of legitimacy.

    b. Defendants and their co-conspirators obtained control of a public "shell" company, and executed the sale and merger of a business with the shell to create the publicly traded company HQGE.

    c. Defendants and their co-conspirators acquired large volumes of shares of HQGE while it was nearly worthless, including through the use of convertible notes based on the company's purported debt to them or their nominees. Using those notes, they converted the purported debt into free-trading, unrestricted shares of HQGE.

    d. Defendants and their co-conspirators controlled and directed the issuance of board resolutions authorizing the conversion of notes into free-trading shares of the HQGE.

    e. Defendants and their co-conspirators artificially inflated or "pumped" the price of HQGE, while concealing their role in generating the favorable attention the company received, including by the following means:

5

    i.  They caused the creation and release of favorable press releases, media attention, and other information to generate public interest in HQGE.

    ii.  They controlled the volume of trading and coordinated the sale of large blocks of shares, timed with press releases and other artificially generated favorable attention.

    iii.  They also used "boiler rooms" to solicit investors to purchase the shares of HQGE.

    iv.  They directed payments for promotion of HQGE, and directed that many payments be made indirectly to conceal the identity of the individuals touting the stock, making them appear to be independent third parties when they were pushing the conspirators' message about the stock.

    v.  They used off-shore entities to pay stock promoters and media companies to promote HQGE stock to investors.

    f.  Defendants and their co-conspirators sold or "dumped" the HQGE shares that they controlled while those shares were artificially inflated or "pumped," while concealing that they, in fact, controlled the shares and the stock of HQGE, including by the following means:

    i.  They prepared by depositing large blocks of shares with registered and unregistered brokers so those brokers could sell the shares without appearing to be selling on behalf of Defendants and their co-conspirators.

    ii.  They sold large blocks of HQGE shares to certain co-conspirators who were aware of the stock manipulation scheme, in order for those co-conspirators also to sell

those shares at a profit when the stocks were promoted, and then pay an agreed-upon percentage back to the Defendants as a kickback.

     iii. They paid other undisclosed commissions and kickbacks to co-conspirators, including unregistered brokers, who helped facilitate the sale shares of HQGE.

     iv. They used manipulative stock trading techniques, such as transferring convertible notes and large blocks of shares to nominees and other entities they controlled, to conceal their control of the stock in HQGE.

     v. They divided up the proceeds from the sale of shares of HQGE in accordance with their respective interests in shares sold, with little to none of the money purportedly invested in HQGE through the stock sales going to fund the company's operations. The funds were instead used to enrich the conspirators and their designees.

  g. Defendants and their co-conspirators provided false, incomplete, and misleading information to attorneys to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al. ("Rule 144" opinions), containing misrepresentations to satisfy legal requirements to deposit stock. These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations, and were provided to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions.

  h. Defendants and their co-conspirators communicated with co-conspirators and others using interstate wires, including e-mail, and encrypted messaging apps, to discuss manipulative stock trading techniques, payments made and money owed.

## COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

The Grand Jury charges:

18. The allegations contained in paragraphs 1 through 17 are re-alleged and incorporated as though fully set forth herein.

19. From in or around November 2017, through in or around December 2018, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants RONALD TOUCHARD and PAUL GARCIA did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit offenses against the United States, to wit: to knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and purchasers and sellers of HQGE securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud).

### Overt Acts

20. In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

21. On or about January 12, 2018, GARCIA caused Hemmingway to purchase a $175,000 convertible note in HQGE from Entity-1.

22. On or about January 16, 2018, TOUCHARD caused ISG to purchase an $85,000 convertible note in HQGE from Entity-1.

23. On or about February 7, 2018, GARCIA caused the conversion of a $15,000 portion of the Hemmingway note into 3,000,000 shares of HQGE.

24. On or about February 7, 2018, TOUCHARD caused the conversion of a $15,000 portion of the ISG note into 3,000,000 shares of HQGE.

25. On or about March 22, 2018, Co-Conspirator-1 and Individual-1 had in person meeting. Co-Conspirator-1 told Individual-1 that Co-Conspirator-1 and Everest ran IR for public companies through the operation of a "phone room." Co-Conspirator-1 stated he and two employees called registered stockbrokers and retail investors from a database Co-Conspirator-1 had compiled. Co-Conspirator-1 told Individual-1 that he had several big upcoming awareness campaigns, which included HQGE. Co-Conspirator-1 stated he (Co-Conspirator-1) had free trading shares of HQGE and the company was looking to raise $60,000 of free trading stock at a discount. Co-Conspirator-1 told Individual-1 that Co-Conspirator-1 would attempt to get HQGE trading over $1.00 per share.

26. On or about April 2, 2018, Co-Conspirator-1 spoke with Individual-1 on the telephone. During the conversation, Co-Conspirator-1 proposed a deal involving HQGE stock. Co-Conspirator-1 also told Individual-1 there would be a lot of "awareness [artificial inflation of the stock]" of HQGE for the deal.

27. On or about April 6, 2018, Co-Conspirator-1 and TOUCHARD spoke with Individual-1 on the telephone. During the conversation, TOUCHARD identified himself as a

9

consultant and "friendly shareholder" of HQGE. TOUCHARD also told Individual-1 that HQGE currently did not have a liquid market for trading, but had no problem depositing stock and had been depositing HQGE shares offshore.

28. On or about April 26, 2018, TOUCHARD spoke with Individual-1 on the telephone. During the conversation, TOUCHARD stated that a large amount of money was being spent on the promotion of HQGE. TOUCHARD also described how the promotional group would allow the conspirators to be able to sell their HQGE shares into the open market. TOUCHARD stated that, by selling in this manner, the promotional group could sell their shares to recoup the money spent on the promotion and would be receiving a "couple million bucks a week." TOUCHARD reiterated to Individual-1 that TOUCHARD and his partner had complete control of HQGE, and that this control extended to "every share and every note."

29. On or about May 1, 2018, TOUCHARD spoke with Individual-1 on the telephone. During the conversation, TOUCHARD confirmed his partner was at Hemmingway and was "Pablo," referring to GARCIA. TOUCHARD discussed a proposal to liquidate HQGE stock, in which Individual-1 would sell stock, and TOUCHARD would receive 80% of the proceeds and Individual-1 would keep 20%. TOUCHARD confirmed he had approximately $1 million worth of HQGE stock to sell. TOUCHARD also confirmed he had 3 million shares of HQGE stock in one offshore brokerage account, 3 million shares at a brokerage firm in the Cayman Islands, and another 3 million shares at the transfer agent, all waiting to be deposited.

30. On or about May 1, 2018, TOUCHARD, using a protonmail.com email address, caused an email to be sent to Individual-1, which contained wire instructions for a bank account ending in x8535 in the name of a nominee, at U.S. Bank.

31. On or about May 2, 2018, TOUCHARD and Individual-1 had a telephone call in which TOUCHARD agreed to an arrangement to where the Individual-1 would liquidate shares of HQGE on TOUCHARD's behalf. TOUCHARD would then receive 75% of the proceeds, and Individual-1 would retain 25% as a kickback. TOUCHARD would tell Individual-1 when to sell the shares during the dump portion of the promotion.

32. On or about May 4, 2018, TOUCHARD and GARCIA caused Individual-1 to send a wire transfer of $25,000 for the purchase of HQGE shares, which was intended to be liquidated on TOUCHARD's and GARCIA's behalf.

33. On or about May 7, 2018, TOUCHARD spoke with Individual-1 in person. During the conversation, TOUCHARD stated Co-Conspirator-2 had received 10% of HQGE stock and gave additional shares to Co-Conspirator-2's associates. TOUCHARD also stated Co-Conspirator-2 published press releases jointly promoting HQGE and another penny stock to create liquidity in HQGE stock, but it did not work as intended. TOUCHARD told Individual-1 the actual promotion of HQGE would start in approximately two weeks. TOUCHARD told Individual-1 that he and GARCIA owned all three notes in HQGE and the only sellers of stock would be the investor relations group, TOUCHARD, and GARCIA. TOUCHARD also confirmed he would start publishing substantial press releases in approximately ten days.

34. On or about May 8, 2018, TOUCHARD and GARCIA spoke with Individual-1. During the conversation, GARCIA told Individual-1 that TOUCHARD and GARCIA had the "tri-fecta structure" which included "control of the CEO, control of the board, and control of the free-trading shares" of HQGE. GARCIA and TOUCHARD asked Individual-1 for money prior to the "campaign" on HQGE beginning.

35. On or about May 10, 2018, TOUCHARD caused a text message to be sent to Individual-1 with pictures of two stock certificates (#1773 and #1774), each for 1 million shares of HQGE, both of which had been issued to Individual-1.

36. On or about May 14, 2018, Co-Conspirator-1 and Individual-1 spoke on the telephone. During the conversation, Co-Conspirator-1 stated he was hiring the promotion group for HQGE, and needed approximately $25,000 to avoid a "going yield," which would mess up the promotion. Co-Conspirator-1 stated HQGE would ultimately be worth $1.00 to $1.50 per share.

37. On or about May 16, 2018, GARCIA caused an email to be sent to the transfer agent, which copied Individual-1 and HQGE's nominee CEO, in which GARCIA instructed the transfer agent not to issue the stock certificate to the Individual-1.

38. On or about May 22, 2018, GARCIA caused an email to be sent to Individual-1, Co-Conspirator-1, and TOUCHARD, which stated the stock certificates for the 2,000,000 shares of HQGE purchased by Individual-1 would be issued under the following conditions:

    a. "Need to know who will be responsible for the shares and monies once traded. I'm assuming it's you, and if so… I would like a copy of your passport and drivers license as well as your actual address. The one I found for you seems to be a PO Box in NY."

    b. "An email indicated the agreed %% and that you will only sale when [Co-Conspirator-1] and us indicate to do so. We can't afford trigger happy selling when we have the type of IR [investor relations, code for efforts to convince potential investors to buy the stock] that we have."

    c. "The wiring of the 12.5k that you indicated you would."

39. On or about May 31, 2018, GARCIA caused the conversion of the Hemmingway note into 3,000,000 shares of HQGE.

40. On or about June 4, 2018, TOUCHARD caused the conversion of the ISG note into 3,000,000 shares of HQGE.

41. On or about June 27, 2018, TOUCHARD spoke with Individual-1. During the conversation, TOUCHARD said that Co-Conspirator-3, from the Cayman Islands, had shorted HQGE. TOUCHARD and GARCIA had given Co-Conspirator-3 shares from Hemmingway, and Co-Conspirator-3 was supposed to hold the shares and liquidate at TOUCHARD and GARCIA's instructions.

42. On or about July 17, 2018, TOUCHARD caused HQGE's nominee CEO to send Individual-1 an email about efforts to promote HQGE, attaching reports on HQGE for June 2018 and July 2018.

43. On or about July 18, 2018, TOUCHARD exchanged text messages with Individual-1, attempting to have Individual-1 call him to speak with him about trading HQGE.

44. On or about July 18, 2018, TOUCHARD and Individual-1 spoke on the telephone. During the conversation, TOUCHARD requested to meet to speak in person about trading HQGE.

45. On or about July 24, 2018, TOUCHARD and Individual-1 spoke on the telephone. During the conversation, TOUCHARD again requested to meet to speak in person about trading HQGE and complained that others had made more money than he had on trading HQGE.

46. On or about August 2, 2018, TOUCHARD caused a certificate for 2 million shares of HQGE to be issued for transfer to Individual-1.

47. On or about August 3, 2018, TOUCHARD caused the certificate for 2 million shares of HQGE to be sent by a commercial interstate carrier from Texas to a U.S. Postal Service post office box in or around Cleveland, Ohio.

48. On or about September 21, 2018, TOUCHARD caused Co-Conspirator-5 to wire $5,945 to ISG's bank account with a memo line "Purchasing of HQGE".

49. On or about October 1, 2018, TOUCHARD caused Co-Conspirator-4 to exchange messages with Individual-1. Co-Conspirator-4 asked if Individual-1 was "set to take more paper [serve as a nominee holder of additional stock]." Co-Conspirator-4 stated, "If this goes well along with full transparency, i have a lot of business for u. Not just clearing stock and selling."

50. On or about October 3, 2018, Co-Conspirator-5 wired $39,900.00 to ISG's bank account with a memo line that read, "Purchasing of HQGE."

51. On or about October 19, 2018, TOUCHARD caused Co-Conspirator-5 to wire $34,900.0 to ISG's bank account with a memo line that read, "Purchasing of HQGE."

52. On or about November 9, 2018, TOUCHARD caused Co-Conspirator-5 to wire $13,121.74 to ISG's bank account with a memo line that read, "Purchasing of HQGE."

53. On or about December 17, 2018, TOUCHARD caused Co-Conspirator-5 to wire $19,440.00 to ISG's bank account with a memo line that read, "Purchasing of HQGE."

All in violation of Title 18, United States Code, Section 371.

### COUNT 2
(Securities Fraud, 15 U.S.C. §§ 78j(b), 78ff and Title 17 C.F.R. § 240.10b-5)

The Grand Jury further charges:

54. The factual allegations contained in paragraphs 1 through 17, and 20 through 37 are re-alleged and incorporated as though fully set forth herein.

55. On or about August 2, 2018, in the Northern District of Ohio, Eastern Division, and elsewhere, defendants RONALD TOUCHARD, PAUL GARCIA, aiding and abetting one another and others presently known and unknown to the Grand Jury, did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstates commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of the securities in HQ Global Education, Inc, to wit: the issuance of certificate purporting to transfer 2,000,000 shares of common stock to an law enforcement-controlled company.

All in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.